IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


DEBORAH N. PARSONS

PLAINTIFF


V.                          Civil No. 2:22-cv-02020-PKH-MEF


KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                          DEFENDANT


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Deborah Parsons, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

### I.      Procedural Background

Plaintiff protectively filed her applications for DIB and SSI on July 17, 2019[1], alleging disability since September 30, 2018, due to lupus, degenerative disk disease ("DDD"), pain in the right leg, sciatic nerve pain, osteoarthritis, diabetes, blurry vision, neuropathy, a heart condition, and sleep apnea.  (ECF No. 10, pp. 15, 60, 72, 84, 174-182, 193, 204-205).  The Commissioner denied Plaintiff's applications initially and on reconsideration, and an administrative hearing was held on September 17, 2020.  (*Id.* at 15, 34-57).  Plaintiff was present and represented by counsel.

---

[1] Plaintiff had filed prior applications for benefits that were denied at the initial phase on September 19, 2010, and August 2, 2017.  (ECF No. 10, p. 202).

On her alleged onset date, Plaintiff was 48 years old and possessed the equivalent of a high school education.  (ECF No. 10, p. 59, 194).  Although she had past relevant work ("PRW") experience as a fast-food worker and manager, customer complaint clerk, home health attendant, and material handler, she performed no substantial gainful activity after her alleged onset date. (*Id*. at 17, 195, 217-221).

On April 16, 2021, Administrative Law Judge ("ALJ"), Edward Starr, identified Plaintiff's degenerative disk disease ("DDD"), diabetes mellitus, major joint dysfunction, and obesity as severe impairments.  (ECF No. 10, p. 18).  He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, but found her capable of performing sedentary work with occasional climbing of stairs, balancing, crawling, kneeling, stooping, and crouching, and no climbing of scaffolds/ladders/ropes.  (*Id*. at 20-21).  With the assistance of a vocational expert ("VE"), ALJ Starr determined she could return to her PRW as a call center customer complaint clerk.  (*Id*. at 26).

On November 22, 2021, the Appeals Council denied Plaintiff's request for review.  (ECF No. 10, pp. 5-9).  She subsequently filed her Complaint to initiate this action.  (ECF No. 3).  Both parties have filed appeal briefs (ECF Nos. 13, 14), and the matter is ripe for resolution.  The case has been referred to the undersigned for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must

affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The

3

fact finder will only consider Plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached.   20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.     Relevant Medical Evidence

The record documents a history of treatment for numerous impairments to include lower back and sacroiliac pain, right knee pain, right heel pain due to plantar fasciitis, fibromyalgia, epigastric pain, depression, and anxiety.   Throughout 2017, she received treatment from orthopedist, Dr. Joseph Bylak, consisting of steroid injections into the knee, a home exercise program, shoe orthotics, and a 3D Cam walking boot.  (ECF No. 10, pp. 908-910, 916-917).  He advised her to limit weightbearing by use of a cane and to avoid deep kneeling, squatting, or bending on the knee and stooping.  (*Id*. at 906-907).

In June 2017, an MRI of Plaintiff's right knee showed arthritic changes in the knee with small joint effusion and a possible free edge or posterior horn medial meniscus tear.  (ECF No. 10, pp. 913-915).

In May 2018, Plaintiff received treatment from physician's assistant ("PA"), Catherine Mustain, at River Valley Primary Care for right sided sciatica, primary osteoarthritis of the right knee, dizziness, and morbid obesity.  (ECF No. 10, pp. 306-318, 444-446, 648, 718-729, 857-859). She prescribed Naproxen and Meclizine and recommended a ten percent weight loss, exercises for sciatica, and smoking cessation.  When Plaintiff returned on August 30, she reported constant pain and a general feeling of malaise.  (*Id*. at 441-444, 851-856).   An exam documented medial collateral ligament ("MCL") tenderness in the right knee, sacroiliac joint tenderness and pain, and epigastric tenderness.  PA Mustain diagnosed a history of helicobater infection, pain in both knees, chronic low back pain with sciatica, and abdominal pain.  She referred Plaintiff to an orthopedist.

On September 27, 2018, orthopedist, Dr. Trent Johnson, treated the Plaintiff for bilateral knee pain.  (ECF No. 10, pp. 439-440, 490, 902-903, 911-912).  She reported grinding, popping, and catching in the knee, as well as sciatic and lower back pain from which Meloxicam had provided some relief.  An exam revealed a limited range of motion in the knees (0-110/0-140), pain with deep flexion, tenderness to palpation about the lateral retinaculum, a positive J-sign (suggestive of patellar maltracking and potential instability), decreased medial excursion at the patella in the left lower quadrant, mild pain about the medial joint line bilaterally slightly worse on the right, and positive straight leg raise tests bilaterally.  X-rays of her knees showed bilateral patella overhang as well as lateral patellar tilt.  Further, an MRI of her right knee confirmed the presence of a posterior horn medial meniscal tear.  Dr. Johnson assessed bilateral knee pain and patella maltracking with heightened lateral retinaculum.  He recommended weight loss and jumpers' knee bands, referred her to physical therapy, and refilled the Meloxicam.

X-rays of her lumbar spine completed in late October showed degenerative changes, including intervertebral disc space narrowing, sclerosing of the vertebral body endplates, and osteophyte and syndesmophyte (bony growths that often occur in the spine causing fusion of the joints) formation.  (ECF No. 10, p. 302).

On October 31, 2018, chiropractor, Dr. Phillip Ulmschneider, began treating the Plaintiff for complaints of moderate pain along the midline in the lumbar region, rated as a 7/10 and exacerbated by standing, bending, lifting, and walking.  (ECF No. 10, pp. 526-527).  She also reported frequent moderate pain in the left and right sacroiliac region and mild to moderate bilateral leg numbness; ankle swelling; bilateral arm numbness; and head pain.  Dr. Ulmschneider documented a decreased range of motion ("ROM") in the cervical and lumbar spine, noted her overall prognosis to be fair, and recommended treatment three times per week for four weeks.

During follow-up appointments between November 2 and December 18, he administered chiropractic adjustments and noted good to excellent motion in the cervical, thoracic, lumbar spine post treatment. (*Id*. at 527-538). Beginning on November 12, he also documented slight improvement in both her pain (midline lower back, bilateral sacroiliac, and head) and numbness (arms and legs). (*Id*. at 531-538).

Due to her obesity, she also began treatment with advanced practical registered nurses ("APRN") at Roller Weight Loss and Advanced Surgery in March 2018. (ECF No. 10, pp. 561-566). Initial treatment consisted of a full work-up with and seven monthly appointments to track her compliance with the presurgical diet, exercise, and weight loss goals established for her. (*Id*. at 561-566, 571-574, 592-607, 611-614). To accomplish these goals, Nurse Michelle Davis recommended an exercise plan that included at least 20 minutes of cardiovascular activity 3 to 4 days per week, performing enough activity to cause sweat and elevate her heart rate, increasing chores at home to help improve her metabolic rate, parking further away in parking lots, and taking stairs whenever possible. During this initial work-up, lab results revealed a high glucose level and an elevated A1c, warranting referral back to PA Mustain for the treatment of diabetes. (*Id*. at 570). At that time, Plaintiff acknowledged diabetic symptoms to include excessive thirst and blurry vision. (ECF No. 10, pp. 429-432, 845-851). She was, however, watching her diet and going to the gym four times per week. An exam revealed her to be both alert and fully oriented with a normal mood, affect, behavior, judgment, and thought content and no physical abnormalities. PA Mustain diagnosed type 2 diabetes mellitus with hyperosmolarity and morbid obesity and prescribed Metformin.

On May 3, 2019, Plaintiff presented in cardiologist Dr. Julio Schwarz's office with complaints of precordial chest pain, shortness of breath, dyspnea on exertion, and intermittent

edema of the ankles occurring at mild to moderate exertion. (ECF No. 10, pp. 420-423). An exam revealed a normal heart rate and rhythm with normal breath sounds, morbid obesity, and 1+ bilateral ankle edema. Further, an electrocardiogram ("EKG") showed normal sinus rhythm and an old anterior myocardial infarction. Dr. Schwarz assessed precordial chest pain, shortness of breath, dyspnea on exertion, stasis edema of the lower extremities, fatigue, an abnormal EKG, type 2 diabetes mellitus without complications, morbid obesity, and severe bilateral knee arthritis, and he ordered a myocardial perfusion imaging study and a two-dimensional echocardiographic doppler study. These tests were ultimately normal, revealing an estimated left ventricular ejection rate of 65 percent. (*Id*. at 461, 925-933). Based on these results, Dr. Schwarz recommended general measures for stasis edema of the lower extremities, strict diabetic control, smoking cessation, aggressive weight reduction, a heart healthy diet, and an active lifestyle as tolerated. Further, he continued her current medical therapy. (ECF No. 10, pp. 400-401, 923).

On May 15, 2019, Plaintiff returned to PA Mustain for a follow-up. (ECF No. 10, pp. 334-338, 346-358, 415-421, 664-681, 838-845). She continued to experience random upper abdominal pain, lower and mid back pain, and bilateral leg/feet swelling with prolonged sitting or standing. However, the Align had helped improve her chronic diarrhea. An exam documented tenderness in the thoracic and lumbar spine, a normal mental status, and a negative depression screen. PA Mustain diagnosed upper abdominal pain, epigastric abdominal pain, chronic midline thoracic back pain, and chronic midline low back pain with right-sided sciatica and referred her back to Dr. Guyer. After documenting pain along the lower thoracic spine and epigastric area, he ordered an MRI of her thoracic spine to rule out a herniated disk pressing on the nerve root, added Amylase and Lipase lab tests to rule out pancreatic involvement, and continued the Align. (*Id*. at 359-374,

412-415, 682-697, 833-837, 1017-1021).    Ultimately, her labs were negative, suggesting no pancreatic involvement.

A sleep study completed on May 21 revealed significant respiratory events with associated oxygen desaturations and arousals and frequent limb movements for which a CPAP was prescribed.  (ECF No. 10, pp. 581-591).

In late May 2019, MRIs of Plaintiff's lumbar and thoracic spine showed mild disc bulges with no high-grade canal stenosis at the L2-3, L3-4, and L4-5 levels; borderline canal dimensions at the L3-4 level; moderate bilateral foramen exit narrowing at the L5-S1 level related to some facet arthropathy and disc bulging; Schmorl's node-type deformities in the mid to lower thoracic spine with mild disc bulges without significant disc protrusion; a small left paracentral disc bulge; minimal protrusions in the mid to upper thoracic spine; small central disc bulges in the mid thoracic spine; and a mild dextro-curvature.  (ECF No. 10, pp. 341-344).

On June 25, 2019, she returned to Dr. Guyer in follow-up.  (ECF No. 10, pp. 375-394, 406-410, 698-717, 751-752, 826-832, 1012-1016).  Her abdominal symptoms had mostly resolved, although she continued to experience intermittent pain in her lower back and worsening arthritis in both hands.  Plaintiff explained that she was in the process of arranging for weight loss surgery and needed to quit smoking before the surgery could be performed.  Dr. Guyer diagnosed inflammatory arthritis, type 2 diabetes mellitus with hyperosmolarity, and morbid obesity. Following an unremarkable exam, he ordered arthritis labs, which revealed an elevated sedimentation rate suggestive of an autoimmune disorder.  Dr. Guyer prescribed Varenicline and continued the Align, Biotin, Vitamin D, Metformin, and Omeprazole and ordered rheumatoid arthritis testing.

On July 2, 2019, Plaintiff complained of generalized body aches and malaise and reported a family history of rheumatoid arthritis. (ECF No. 10, pp. 402-405, 737-745, 747-750, 821-826, 999-1011). Dr. Guyer diagnosed inflammatory arthritis, based on a positive ANA screen with reflex and an elevated C-reactive protein value, and referred her to a rheumatologist. Lab values also revealed elevated blood glucose.

On August 30, 2019, Plaintiff returned to Dr. Guyer for a recheck. (ECF No. 10, pp. 547-550, 815-821, 993-998). She had stopped but was experiencing a progressively worsening cough, wheezing, and a mild headache. An exam confirmed the presence of scattered wheezes in all lung fields. Dr. Guyer diagnosed chronic bronchitis and prescribed an Albuterol inhaler, Tussionex, and a Salmeterol Diskus.

On September 19, 2019, a non-examining consultant, Dr. Ronald Crow, reviewed the record and completed an RFC assessment. (ECF No. 10, pp. 65-67, 77-79). He concluded the Plaintiff could perform light work with the occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, but no climbing of ladders/ropes/scaffolds.

That same day, Dr. Ulmschneider at Ozark Chiropractic Clinic evaluated the Plaintiff for complaints of constant low back and hip pain with numbness in the legs and feet. (ECF No. 10, p. 525). He indicated she was limited to standing or walking for 30 minutes and lifting no more than 10 pounds. According to his notes, Plaintiff had been unable to work due to pain and dysfunction associated with osteoarthritis at the T11-L5 levels and disc degeneration at the L4-5 level. Dr. Ulmschneider noted that these factors would compete with her recovery and interfere with normal daily function.

On September 20, 2019, Plaintiff conferred with bariatric surgeon, Dr. Yong Kwon, regarding the possibility of surgical intervention. (ECF No. 10, pp. 617-619). He noted multiple

unsuccessful attempts at weight reduction by medical programs with excessive weight beginning to have a significant impact on the management of her other medical problems.  Dr. Kwon found her to be a satisfactory candidate for weight loss surgery, specifically the laparoscopic biliopancreatic diversion with duodenal switch procedure, and scheduled the procedure.

Four days later, Plaintiff presented to Dr. Guyer with a chronic cough and continued wheezing.  (ECF No. 10, pp. 542-546, 808-814, 986-992).  She had been taking Tussionex, with only limited success.  An exam confirmed the presence of expiratory wheezes in all lung fields. Dr. Guyer diagnosed chronic bronchitis, administered a steroid injection, and prescribed a Medrol Dosepack.  He noted that her bariatric surgery might need to be postponed.

On October 17, 2019, Plaintiff was well enough to undergo a laparoscopic biliopancreatic diversion with duodenal switch.  (ECF No. 10, pp. 554-560).  When she left the following day, she was ambulating without difficulty and was instructed to do so multiple times per day but prohibited from any heavy lifting or strenuous exercise.  Thereafter, Plaintiff attended monthly post-surgical follow-ups with the nurse practitioners at Roller Weight Loss and Advanced Surgery.  (*Id*. 624-627, 873-887).  By November 27, she was doing well and had lost a total of 28 pounds since surgery.

During a December follow-up with Dr. Guyer, Plaintiff requested medication to treat her anxiety.  (ECF No. 10, pp. 981-985).  Although she had stopped smoking five months earlier, she had recently started back again.  Accordingly, Plaintiff also requested another round of Chantix. Dr. Guyer noted some anxiety on exam and prescribed daily Zoloft with Klonopin to be taken on an as needed basis.

On December 17, 2019, Plaintiff consulted with a rheumatologist, Dr. Roy Sampson.  (ECF No. 10, pp. 633 -637).  She reported being sick a lot over the past two years, along with joint and

muscle pain, primarily in her wrists, ankles, and knees, which she rated as a 5/10.  Additionally,

the Plaintiff complained of intermittent blurry vision, anxiety, headaches, an occasional rash on

her face, some swelling in her feet, and cramping/locking up in her hands when she was working.

She also had trouble getting up and down from sitting.  An exam documented moderate diffuse

tenderness to palpation in the shoulders, elbows, wrists, metacarpophalangeal joints ("MCPs"),

proximal interphalangeal joints ("PIPs"), hips, knees, ankles, feet, neck, thoracic spine, and lumbar

spine.  Additionally, she had 18/18 positive fibromyalgia tender points.  Labs also documented a

mildly positive ANA.  Dr. Sampson diagnosed diffuse pain and tenderness, fatigue, a mildly

positive ANA (mild), and hand, foot, and back pain.  X-rays of her hands were normal, while x-

rays of her lumbar spine showed mild degenerative changes.  (ECF No. 10, pp. 763-764).  X-rays

of her feet also showed minimal bony osteophytes in the midfoot of both feet with no evidence of

inflammatory arthritic changes.  (ECF No. 10, pp. 762-763).

On January 9, 2020, Dr. Patrick Fields conducted an independent review of the record, and

he affirmed Dr. Crow's September 2019 assessment.  (ECF No. 10, pp. 90-93, 104-107).

This same day, Plaintiff followed-up with Dr. Sampson.  (ECF No. 10, pp. 758-759, 765-

794, 974-980).  She reported feeling okay, although she continued to experience a dull, achy pain

in her wrists, knees, ankles, and lower back and a burning sensation in her feet, which she rated as

a 5/10.  Dr. Sampson concluded Plaintiff's symptoms were likely caused by fibromyalgia, noting

that she might benefit from medications like Gabapentin, Lyrica, or Cymbalta.  Plaintiff agreed to

discuss these further with her primary doctor.  He found no evidence of an auto inflammatory

process that would warrant an immunosuppressive medication.

On January 17, 2020, Plaintiff returned to Dr. Guyer to discuss her recent fibromyalgia

diagnosis.  (ECF No. 10, pp. 801-807).  She also reported symptoms consistent with restless leg

syndrome, as well as impaired sleep, depression, and a pruritic rash on the right side of her back. Further, Plaintiff admitted that she continued to "smoke weed every now and then."  Noting scattered erythema on the right side of her back, Dr. Guyer diagnosed fibromyalgia, insomnia, restless leg, depression, and dermatitis.  He prescribed Requip to treat her restless leg complaints and to help her sleep, noting that he would consider switching her from Zoloft to Cymbalta if her fibromyalgia symptoms persisted.

On February 17, 2020, Plaintiff underwent an initial assessment with Gary Greenwood, a Licensed Professional Counselor at The Guidance Center.  (ECF No. 10, pp. 943-953).  Among numerous complaints, Plaintiff described a depressed mood, feelings of worthlessness, insomnia, irritability, low energy, social withdrawal, crying spells, excessive worry, racing thoughts, and difficulty focusing and concentrating.  Although she had worked until 2017, Plaintiff was now dependent upon her adult children.  Counselor Greenwood diagnosed major depressive disorder and generalized anxiety disorder for which she had been prescribed Zoloft and Klonopin.  Plaintiff denied a history hospitalization and/or residential treatment for her mental impairments, despite recounting a history of being raped on multiple occasions and suffering from physical abuse and neglect as a child.  Counselor Greenwood diagnosed major depressive disorder and generalized anxiety disorder, noting severe occupational impairments and moderate social, familial, and self-care impairments.  Her mood was apathetic, her behavior irritable and anxious, and her thought processes normal.  She reported no homicidal or suicidal ideations.  Counsel Greenwood recommended annual psychiatric assessments, bimonthly behavioral health counseling, and medication management.

By April 2020, Plaintiff had lost a total of 84 pounds since her bariatric surgery.  (ECF No. 10, pp. 873-877).  She had good energy and was compliant with her diet.  She was not, however,

taking her bariatric vitamins due to financial constraints and was not taking the Metformin or checking her blood sugar levels with any regularity.

The following month, she underwent a psychiatric assessment with ARNP Amber Mobley at The Guidance Center. (ECF No. 10, pp. 938-942). Plaintiff advised that she had "everything figured out" and was receiving medications through her primary care physician. She was unable to take Klonopin twice per day due to daytime fatigue and lethargy but felt that therapy was helpful as she had learned that stress/conflict exacerbated both her anxiety and panic. Plaintiff also admitted occasionally using marijuana. Her mood was depressed and her affect dull, however, she exhibited appropriate behavior, had good insight and judgment, and had normal thought processes. Nurse Mobley diagnosed major depressive disorder and generalized anxiety disorder, noting her progress to be slow.

On June 26, Dr. Guyer treated Plaintiff for continued problems with fibromyalgia, insomnia, and worsening pain throughout her lower back, despite her recent weight loss. (ECF No. 10, pp. 795-801, 969-974). She also reported continued mild depression, opining that the Zoloft was no longer as helpful as it was initially. An exam revealed pain throughout the lumbar spine and generalized body aches. Dr. Guyer diagnosed fibromyalgia, depression, and chronic midline low back pain. He advised her to wean down off the Zoloft over next two weeks and begin Cymbalta.

In July 2020, LPC Gary Greenwood completed a Mental RFC Assessment dating back to February 17, 2020, when the Plaintiff first began outpatient therapy. (ECF No. 10, p. 642). He noted her to be unable to effectively function on a sustained basis in the following areas: adhering to a schedule; maintaining regular attendance; being punctual consistently (due to physical pain); adapting and self-managing; sustaining an ordinary routine without supervision; interacting

13

appropriately with supervisors and accepting supervision, instructions, or criticism (told a supervisor to get off her duff and go do her job because patient was not going to do their job too); interacting appropriately with co-workers in a usual work setting (generally, but not always); and relating predictably in social situations (in most situations, but not all, anger/depression is displayed). Counsel Greenwood noted that her depression and subsequent behaviors were actively interfering with her ability to show tolerance, remain calm, and interact with others in a predictable, stable manner. She appeared/seemed angry much of the time and tended to demonstrate daily anger toward herself and others, often placing herself in her room to avoid others and to calm down.

On July 10, 2020, Dr. Guyer refused to complete a physical RFC because his clinic was "federally funded." (ECF No. 10, p. 643).

Approximately one month later, Plaintiff reported a total weight loss of 131.5 pounds nine months status post bariatric surgery. (ECF No. 10, pp. 868-873). Nurse Branson noted normal mental status and physical exams. And Plaintiff continued to focus on a high protein balanced diet and regular exercise.

On August 15, 2020, she was treated in the emergency room ("ER") for back pain. (ECF No. 10, pp. 868-873). Although the Plaintiff admitted her pain was typically well controlled via over the counter ("OTC") pain medications, it had significantly worsened. The doctor noted tenderness in the left lower lumbar but no acute distress and normal behavior.

Two weeks later, Plaintiff returned to Dr. Guyer for a post ER check-up. (ECF No. 10, pp. 964-969). She reported a recent fall that had strained her lower back. As a result, Plaintiff described knots and muscular pain throughout her low back, exacerbated by bending, as well as consistent right knee pain. She indicated that the OTC anti-inflammatories she had been taking

were of no assistance.  Plaintiff also recounted allergy symptoms and requested a dermatology referral for a worsening plantar wart on her right foot.  Dr. Guyer prescribed Tizanidine for lower back pain, advising her to avoid Klonopin while taking this medication.  He also recommended Zyrtec and Flonase for her allergies, referred her back to the orthopedist for her knee pain, and advised against bending or heavy lifting.

On March 1, 2021, Dr. Samuel Hester conducted a consultative mental exam.  (ECF No. 10, pp. 1036-1044).  He noted Plaintiff had been enrolled in both therapy and medication management for a brief period but, due to alleged transportation issues, she had to quit both.  She was, however, still receiving her psychiatric medications through her primary care physician, receiving prescriptions for Ropinirole, Duloxetine, Tizanidine, and Klonopin.  She was reportedly compliant with her medications, reporting sedation as the only significant side effect.  Further, Plaintiff indicated that her medications were helpful in stabilizing her mood and reducing her anxiety.  An exam revealed slow movement due to pain with a slightly depressed mood and appropriate affect.  Dr. Hester diagnosed depressive disorder, panic disorder without agoraphobia, pain disorder, and fibromyalgia.  After assessing a global assessment of functioning score of 50, he concluded that she maintained the capacity to communicate and interact in a socially adequate manner; communicate in an intelligible and effective manner; cope with the mental demands of basic work tasks (she lost jobs due to medical issues, not mental health issues); attend to and sustain concentration on basic tasks; and sustain persistence in completing tasks.  However, Dr. Hester indicated she might not be able to complete tasks within an acceptable timeframe due to her pain.  From a functional perspective, he also noted her admission that she could drive unfamiliar routes, shop, handle her finances, and perform most of her activities of daily living ("ADLs") autonomously.

## IV.    Discussion

Plaintiff raises several issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at step two by failing to include her depression as a severe impairment; and (3), whether the ALJ erred in his RFC determination.  After a thorough review of the record, the undersigned recommends affirming the ALJ's decision to deny benefits in this case.

### A.    Development of the Record

In her first issue, the Plaintiff asserts that the ALJ failed to develop the record fully and fairly by refusing to order a consultative/orthopedic examination.  The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record.  *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).  While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."  *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

As detailed in the previous section, the 1,044-page administrative record contains numerous treatment notes documenting Plaintiff's treatment for her physical complaints.  She is correct in her assertion that Dr. Ulmschneider penned a letter in September 2019 indicating that she would be limited to lifting no more than 10 pounds and standing and walking for 30 minutes.  We also note that Dr. Guyer advised against bending and heavy lifting, and both agency physicians found Plaintiff capable of performing light work with only occasional climbing of ramps and stairs,

balancing, stooping, kneeling, crouching, and crawling and no climbing of ladders/ropes/scaffolds. Based on the totality of the evidence, however, the ALJ found the Plaintiff capable of performing sedentary work with those same postural limitations.  Plaintiff contends that the ALJ's inference that she could perform sedentary work was impermissible because it was not based upon medical evidence.  We disagree.  The RFC is a decision left to the discretion of the Commissioner and there is no requirement that it be supported by specific medical opinion.  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *see also Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (while RFC assessment draws from medical sources for support and must be supported by some medical evidence, it is ultimately an administrative determination reserved to Commissioner).  Therefore, we find sufficient evidence in the record upon which the ALJ could determine that the Plaintiff's physical impairments were not disabling and conclude that no further development was required.

## B.     Step Two Findings

Plaintiff also insists that the ALJ erred by failing to include her depression as a severe impairment.  At Step Two, a claimant has the burden of providing evidence of functional limitations in support of their contention of disability.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)).  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)).

At the outset, we note that the evidence documenting Plaintiff's mental impairments is somewhat scant.  In fact, throughout the relevant period, the majority of the records document Plaintiff as cooperative with a normal mood and affect, intact memory, no attention deficits, good

insight and judgment, and logical thought processes.  It was not until December 2019 when she voiced complaints of generalized anxiety.  At that time, Dr. Guyer prescribed Zoloft and Klonopin.  And Plaintiff did not seek out professional mental health treatment until February 2020, when she was assessed with major depressive disorder and generalized anxiety disorder by Counselor Greenwood at The Guidance Center.  He recommended both counseling and medication management.  Interestingly, at her psychiatric evaluation, Plaintiff admitted that she was doing well and had "everything figured out."  Then, due to alleged transportation issues, she failed to follow through with treatment, receiving only medication from her primary care physician.  With his limited insight, due to Plaintiff's short history with the Guidance Center, Counselor Greenwood completed a checkbox form in July 2020, noting her to be unable to effectively function on a sustained basis in the following areas: adhering to a schedule; maintaining regular attendance; being punctual consistently; adapting and-managing herself; sustaining an ordinary routine without supervision; interacting appropriately with supervisors and accepting supervision, instructions, or criticism; interacting appropriately with co-workers in a usual work setting; and relating predictably in social situations.  He admitted, however, that these perceived limitations were related either to her physical pain or to her self-reported behaviors and subjective complaints.  Aside from noting her to be angry on more occasions than not, Counselor Greenwood provided no objective justification for his opinion.

Consistent with his duty to develop the record, in 2021, the ALJ ordered a consultative mental evaluation with Dr. Hester, who made the same diagnoses as Counselor Greenwood.  However, he concluded the Plaintiff maintained the capacity to communicate and interact in a socially adequate manner; communicate in an intelligible and effective manner; cope with the mental demands of basic work tasks (she lost jobs due to medical issues, not mental health issues);

attend to and sustain concentration on basic tasks; and sustain persistence in completing tasks. Dr. Hester did indicate she might not be able to complete tasks within an acceptable timeframe due to her physical pain. But the Plaintiff admitted to Dr. Hester she could drive unfamiliar routes, shop, handle her finances, and perform most of her activities of daily living ("ADLs") autonomously. Plaintiff had also completed a function report wherein she acknowledged the ability to care for her children, care for her personal hygiene with some physical limitations, drive, go out alone, shop in stores for food and basic needs, handle her finances, watch television daily, and communicate regularly with others via telephone and social media. (ECF No. 10, pp. 206-215). Further, somewhat inconsistently, she reported difficulty getting along with others while getting along well with authority figures and admitted she had never been fired due to interpersonal issues.

Accordingly, while the Plaintiff does carry diagnoses of depression and anxiety, a mere diagnosis alone is not sufficient to establish disability. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) (holding there must be some evidence to establish a functional loss resulting from said diagnosis). By her own accounts, the medications prescribed were effective in treating her mental impairments and she "had everything figured out." *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). Therefore, we do not find error in the ALJ's determination that her depression and anxiety were not severe impairments, as she had no limitation in the ability to understand, remember, or apply information; to interact with others; or to adapt and manage herself; and only a mild limitation in her ability to concentrate, persist, or maintain pace.

### C.    RFC Determination

In her final argument, the Plaintiff posits that the ALJ's RFC determination is erroneous because it fails to account for both her mental impairments and her chronic pain. RFC is the most

a person can do despite that person's limitations.  20 C.F.R. §§ 404.1545, 416.945.  A disability claimant has the burden of establishing her RFC.  *Vossen*, 612 F. 3d at 1016.  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that RFC is a medical question."  *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, the ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

For the same reasons enumerated in the previous section, we do not find substantial evidence to support the need for mental restrictions in the RFC.  And, contrary to the Plaintiff's argument, the ALJ did explain why he did not find Counselor Greenwood's opinion to be persuasive.

While we agree that the record documents a history of treatment for pain in various areas of the body, culminating in a diagnosis of fibromyalgia in December 2019, the only restrictions ever mentioned by Plaintiff's treating doctors were the avoidance of heavy lifting and bending.  Moreover, aside for some tenderness and tender points, physical exams conducted throughout the relevant period were benign.  Plaintiff consistently exhibited a normal gait.  The ALJ ultimately concluded she could perform sedentary work, which requires lifting no more than ten pounds at a time.  SSR 96-9P, 1996 WL 374185, *3.  Although the ALJ did find her capable of occasional posturals, except for the inability to climb ladders/ropes/scaffolds, we note that sedentary work

does not require bending or twisting and involves only occasional stooping. Therefore, the ALJ's RFC is consistent with the limitations imposed by Plaintiff's treating physicians and supported by substantial record evidence.

### IV.    Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed, and that the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of February 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE